# EXHIBIT B

**FILED**

4/1/2025 1:17 PM

Erin Cartwright Weinstein
**Clerk of the Court
Lake County, Illinois**

STATE OF ILLINOIS      )
                       ) SS
COUNTY OF LAKE         )

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

KEELY
K̶E̶L̶Y̶ ROBERTS, individually and as parent )
and next friend of C.R. and L.R., and JASON )
ROBERTS, individually and as parent and next )
friend of C.R. and L.R., )
)
                    Plaintiffs, )
)
v. )
)
SMITH & WESSON BRANDS, INC., et al., )
)
                    Defendants. )
)
              And )
)
CYBEAR INTERACTIVE, LLC, et al., )
)
       Respondents in Discovery )

Case No. 22 LA 00000487

Consolidated with Case Nos.
22 LA 00000488, 22 LA 00000489,
22 LA 00000490, 22 LA 00000491,
22 LA 00000492, 22 LA 00000493,
22 LA 00000494, 22 LA 00000495,
22 LA 00000496, 22 LA 00000497,
22 LA 00000532, 22 LA 00000201,
22 LA 00000203, 22 LA 00000206,
22 LA 00000466, 22 LA 00000471,
22 LA 00000474, 22 LA 00000475,
22 LA 00000476, 22 LA 00000477,
22 LA 00000478, 22 LA 00000479,
22 LA 00000480, 22 LA 00000481

## ORDER ON SMITH & WESSON'S MOTION TO DISMISS THE ROBERTS AND RELATED COMPLAINTS

This matter comes before the Court on Defendant's, Smith & Wesson, Motion to Dismiss the Roberts and related Complaints. Having heard arguments on this Motion, considered the statutory authority and case law, and being fully advised in the premises, the Court now FINDS AS FOLLOWS:

### BACKGROUND

On July 4, 2022, twenty-one-year-old Robert Crimo III positioned himself on a rooftop in downtown Highland Park and fired 83 rounds from an assault rifle into the crowd below that was gathered for the 4th of July parade. Seven people were killed, 48 others were injured, and countless others suffered injuries in the aftermath. Crimo III ("shooter") carried out this massacre using a Smith & Wesson Military and Police ("M&P") assault rifle that was allegedly

1

manufactured, distributed, and ultimately sold to the shooter by the various Defendants in this case. There is no doubt that the shooter was directly and primarily responsible for this horrific series of crimes. However, those injured in the massacre, as well as those representing the estates of the decedents, contend that Smith & Wesson, BudsGunShop.com, and Red Dot Arms also bear some of the blame.

## PROCEDURAL HISTORY

The various Plaintiffs filed Complaints in these consolidated actions in 2022 and 2024. The Plaintiffs set forth a number of legal theories as to why the Defendant (Smith & Wesson) should be held partly responsible for this tragedy.[1] All Plaintiffs have brought statutory and negligence claims against Smith & Wesson based on violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 & 505/2DDDD) and the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/2, et seq.). Some Plaintiffs bring claims for Negligent Infliction of Emotional Distress and Intentional Infliction of Emotional Distress. The Uvaldo Plaintiffs bring a Negligent Entrustment claim against Smith & Wesson.

Defendants Smith & Wesson bring Motions to Dismiss Plaintiffs' claims pursuant to 735 ILCS 5/2-615 and 2-619. They argue that all of Plaintiffs' legal theories are not only barred under Illinois law, but also precluded by a federal statute, the Protection of Lawful Commerce in Arms Act (PLCAA), which immunizes firearms manufacturers, distributors, and dealers from civil liability for crimes committed by third parties using their weapons. See 15 U.S.C. §§7902(a) and 7903(5) (2025).

## ANALYSIS

### I.    Dismissal pursuant to 735 ILCS 5/2-615

A section 2–615 motion attacks the legal sufficiency of a complaint. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1, 8 (1992); *Tim Thompson, Inc. v. Vill. of Hinsdale*, 247 Ill. App. 3d 863, 880–81 (2d Dist. 1993). Its purpose is not to raise affirmative defenses but allege only defects on the face of the complaint. *Id.* "The question presented by a motion to dismiss for failure to state a cause of action is whether sufficient facts are contained in the pleadings which, if established, could entitle the plaintiff to relief." *Id.* at 9. In making such a determination, the court is to interpret the allegations of the complaint in the light most favorable to the plaintiff. *Id.*

---

[1] Plaintiffs also bring claims against BudsGunShop.com, LLC, Red Dot Arms, Inc., Robert Crimo III and Robert Crimo Jr. However, this order addresses only the Motion to Dismiss brought by Defendants Smith & Wesson.

It is well established that the court must accept as true all well-pleaded facts in the complaint and all reasonable inferences which can be drawn therefrom. *Id.*.

### a. Does Smith & Wesson owe Plaintiffs a duty to protect them from criminal conduct?

Smith & Wesson requests dismissal of Plaintiffs' negligence-based common law and statutory claims pursuant to 2-615 arguing they do not owe Plaintiffs a duty to protect them from criminal conduct. To succeed on a negligence claim, a plaintiff must "allege facts establishing the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by the breach." *Thompson v. Gordon*, 241 Ill.2d 428, 438 (2011).

Relying on *The City of Chicago v. Beretta U.S.A Corp*, 213 Ill.2d 351 (2004), Smith & Wesson maintains that manufacturers "owe no duty. . . to prevent their firearms from 'ending up in the hands of persons who use and possess them illegally.'" *Beretta*, 213 Ill.2d at 393-94. Further, Smith & Wesson contends that third-party criminal conduct cannot create such a "duty" in the absence of a "special relationship" between the parties. See *Iseberg v. Gross*, 227 Ill.2d 78, 87-88 (2007); *Marshall v. Burger King Corp.*, 222 Ill.2d 422 438 (2006). No special relationship such as "common carrier-passenger, innkeeper-guest, business invitor-invitee, and voluntary custodian-protectee" has been alleged here.

In response, Plaintiffs state that Illinois has long recognized a duty of ordinary care owed by every person to all others "to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act." *Doe v. Coe*, 2019 IL 123521, ¶37. When determining whether there is a common-law duty of care, courts consider "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing the burden on the defendant." *Flores v. Aon Corp.*, 2023 IL App (1st) 230140, ¶24. In addition, Smith & Wesson also owes duties that flow from the Illinois Consumer Fraud and Deceptive Business Practices Act (the "CFA"). As alleged in Plaintiffs' Complaints, Smith & Wesson violated the CFA, which sets out a duty on the part of all companies that do business in Illinois to refrain from "unfair or deceptive acts or practices." Thus, Smith & Wesson owes duties to Plaintiffs grounded in principles of foreseeability and, separately, based on statutory law.

In Illinois, "every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." *Simpkins v. CSX Transportation, Inc.*,

2012 IL 110662, ¶ 19. To this end, if an individual's conduct "creates a foreseeable risk of injury, the individual has a duty to protect others from such injury." *Id.; Bogenberger v. Pi Kappa Alpha Corp.*, 2018 IL 120951, ¶ 22. To determine whether a duty exists, the critical question is whether the defendant and the plaintiff "stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Id.* To answer this question, four factors are utilized: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Id.; Simpkins,* 2012 IL 110662, ¶18.

Here, Plaintiffs have alleged sufficient facts to conclude that Smith & Wesson's marketing strategies of targeting younger demographics and promoting unlawful military type assaults created a foreseeable risk of injury to Plaintiffs. The Complaints allege that Smith & Wesson's deceptive and unfair marketing practices would induce its target audience to purchase its product and be utilized in a mass shooting or gun violence, particularly considering the increasing number of highly publicized mass shootings that have occurred across the United States. (McCarthy Complaint, ¶¶54-68). Plaintiffs allege that Smith & Wesson deployed marketing practices purposely targeted at putting assault weapons in the hands of thrill-seeking young men and this led to gun violence. Further, Smith & Wesson knew that assault rifles, and particularly its M&P rifles, had been repeatedly used by mass shooters. (Roberts, et al. Complaint, ¶¶90-92).

Further, the court agrees with Plaintiffs that the third and fourth factors regarding the magnitude of the burden and consequences of placing that on the Defendants are minute and weigh in favor of Plaintiffs. As stated by Plaintiffs, Defendants are already expected to follow the law and not engage in harmful and deceitful practices that could foreseeably cause harm to others. This is unlike in *City of Chicago v. Beretta*, where Chicago sued a large portion of the gun industry for creating a public nuisance in the city. 213 Ill.2d 351, 355 (2004). There were no allegations by plaintiff that defendants had violated any laws, and this appears to be critical in the court's decision not finding a duty. In that case, the court concluded that the magnitude and consequence of the burden weighed against finding a duty. *Id.* at 392-93. That is not the case here, where there are allegations that Defendants have violated laws against engaging in deceptive and unfair practices. Thus, there appears to be no imposition of a new duty on

Defendants, but rather the duty to refrain from conduct that violates already established obligations.

Smith & Wesson additionally argues that third-party criminal conduct cannot create such a "duty" in the absence of a "special relationship" between the parties. *See Iseberg v. Gross*, 227 Ill.2d 78, 87-88 (2007); *Marshall v. Burger King Corp.*, 222 Ill.2d 422, 438 (2006). However, the duty analysis begins with the question of whether the defendant by act or omission created or contributed to a risk of harm to the plaintiff. *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 21; *Bruntjen v. Bethalto Pizza, LLC*, 2014 IL App (5th) 120245, ¶¶ 40-41. If the answer to that question is yes, then the court proceeds to analyze the four relationship factors. *Id.* However, if the answer to the above question is no, then the court addresses whether there were any special relationships that establish duty between the defendant and the plaintiff, *i.e.*, common carrier/passenger, innkeeper/guest, custodian/ward, and possessor of land who holds it open to the public/member of the public who enters in response to the possessor's invitation. *Id.* ¶ 21; *Bruntjen*, at ¶¶ 40-41.

Here, Smith & Wesson conflates an affirmative duty to aid or protect another against the criminal acts of the shooter (where a "special relationship" must exist), with the duty to refrain from acts or omissions that contribute to the risk of harm of another. While *Beretta* determined there was no duty owed to the public at large with respect to the manufacturer and distributor defendants, the court applied the four traditional factors to make the determination of whether there was a duty owed. It did not discuss, nor require, a "special relationship." The court in *Marshall v. Burger King Corp.* determined that the duty in question was to aid or protect persons from criminal or negligent acts of others and, thus, a "special relationship" must exist between the parties. There was no determination or discussion as to whether defendants themselves engaged in any unlawful conduct that contributed to the plaintiff's harm.

As correctly pointed out by Plaintiffs, in this case the allegations in the Complaint assert that Defendants, by their acts, contributed to the risk of harm to Plaintiffs. Their claims are not premised upon the theory that Smith & Wesson failed to act, but that they breached a duty of reasonable care by affirmatively acting in a manner that unreasonably exacerbated a risk of harm. *Simpkins v. CSX Transp., Inc.*, 2012 IL 110662, ¶21. Further, the court finds that the *Vesely* case cited by Smith & Wesson is distinguishable from this case in important ways. The *Vesely* court noted that the defendant website operator "permitted [the seller] to place an advertisement [for the sale of the gun] on its website and nothing more." *Vesely v. Armslist, LLC*, 762 F.3d 661, 666

(7th Cir. 2014). It further noted that a duty to refrain from affirmative conduct that creates a risk of harm can exist in the absence of a "special relationship" where an initial tortfeasor provides "substantial assistance or encouragement" to a third party who directly causes the harm. *Id.* But, in *Vesely,* the allegations were insufficient because "enabling consumers to use a legal service is far removed from encouraging them to commit an illegal act[,]" and the website's actions did not "invite" the third party criminal "to break the law." *Id.* at 666. Here, the Plaintiffs' allegations demonstrate Smith & Wesson went beyond passively hosting advertisements posted by a third party on a website. The allegations state Smith & Wesson engaged in a pervasive marketing campaign designed to specifically target and motivate people like the shooter and to prime them to use products like the Rifle in mass shootings. The Complaint allegations go far beyond stating Smith & Wesson enabled the shooter, but engaged in affirmative acts to encourage the shooter to commit the illegal acts. Thus, the finding of a "special relationship" is not required here.

Moreover, the Plaintiffs have sufficiently established that even if a common law duty of care does not exist, Smith & Wesson owed duties based on statutory law. Plaintiffs state the CFA sets out a duty on the part of all companies that do business in Illinois to refrain from "unfair or deceptive acts or practices." 815 ILCS §505/2. Further, §2DDDD of the CFA confirms that the Act has always applied to firearms companies and specifies that the duty to refrain from unfair acts includes a duty to refrain from encouraging individuals who are not members of the military "to use a firearm-related product for a military-related purpose in Illinois." §505/2DDDD(b)(2) (Firearm Industry Responsibility Act "FIRA").

Smith & Wesson first argues that basing a statutory duty on FIRA is flawed because the adoption of an amendment in 2023 cannot retroactively change the duties allegedly owed by firearm manufacturers at the time of the 2022 shooting. However, the court does not agree that FIRA changed or added duties owed by firearm manufacturers. Plaintiffs correctly point out that the Illinois legislature expressly provided that 815 ILCS 505/2DDDD is "declarative of existing law and shall not be construed as new enactments" and FIRA provides examples of the unfair or deceptive acts that are prohibited by other provisions of the CFA that were in effect at the time of the 2022 shooting.

Even so, Smith & Wesson takes issue with cases cited by Plaintiffs to establish that statutory duties can support negligence claims. They argue *Flores v. Aon Corp.* only considered the statutory duty imposed on employers who manage personal information for employees to

protect against data breaches of those employees' confidential data. 2023 IL App (1ˢᵗ) 230140, ¶¶23-24.  However, the court fails to understand how this argument amounts to support for maintaining that the CFA and FIRA do not establish duties that can support negligence claims. The Information Protection Act discussed in *Flores* does not contain language making it only applicable to employers who manage information for employees, but creates a duty for all data collectors to maintain reasonable security measures under the Act, much the same as the CFA creates a duty for all businesses in Illinois to refrain from "unfair or deceptive acts or practices." Neither the *Flores* court nor the court in *Pilotto v. Urb Outfitters W. LLC* discussed or concluded, as asserted by Smith & Wesson, that statutory duties were not recognized to those "who, (i) were not employees but who may have been later impacted by the release of an employee's data, (ii) may have been later injured by the patron who was improperly denied restroom access, or (iii) claim to have been injured at the end result of numerous intervening events." (Smith & Wesson Reply brief, pg. 9).  This seems to be an argument as to standing to bring a claim under the statute, rather than establishing a statutory duty for a negligence claim.  Further, the *Pilotto* court definitively stated, "a tort duty can derive either from the common law or from statute."  2017 IL App (1ˢᵗ) 160844, ¶18.  Thus, Plaintiffs have sufficiently alleged that Smith & Wesson owed a duty to them.

**b.  Did Smith & Wesson's marketing and advertising proximately cause Plaintiffs' injuries?**

The term "proximate cause" encompasses two distinct requirements: cause in fact and legal cause. *Young v. Bryco Arms*, 213 Ill. 2d 433, 446 (2004); *Lee v. Chicago Transit Authority,* 152 Ill.2d 432, 455 (1992). Together, cause in fact and legal cause provide the boundary of "how far a defendant's legal responsibility should be extended for conduct that, in fact, caused the harm." *Id.* In cases involving intervening causes, Illinois courts draw a distinction between a condition and cause, which is just "another way of presenting the cause-in-fact analysis." *Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172459, ¶ 66. A condition provides an opportunity for causal agencies to act (cause in fact) while legal cause actually produces the injury. *Thompson v. Cnty. of Cook*, 154 Ill.2d 374, 383 (1993); *see also Inman*, 2019 IL App (1st) 172459, ¶ 64. Although proximate cause is generally a question of fact (*Lee,* 152 Ill.2d at 455), the lack of proximate cause may be determined by the court as a matter of law where the facts alleged do not sufficiently demonstrate both cause in fact and legal cause.  *Young v. Bryco Arms,* 213 Ill. 2d 433, 447 (2004).

7

Smith & Wesson first argues Plaintiffs cannot establish cause in fact because they have not made any factual allegations that the shooter saw any of their advertisements, many of which were published before the shooter bought the Rifle. Further, they assert even if the shooter saw any of the advertisements, the Plaintiffs have failed to allege any facts to support that said advertisements influenced the shooter to engage in conduct two and a half years after his purchase.

When ruling on a motion to dismiss pursuant to 735 ILCS 5/2-615, the court must accept as true all well-pleaded facts in the complaint, as well as any reasonable inferences that may arise from them. *Borcia v. Hatyina*, 2015 IL App (2d) 140559, ¶ 20. The merits of the case, at this point, are not yet considered. See *Kilburg v. Mohiuddin*, 2013 IL App (1st) 113408, ¶ 19. However, a court cannot accept as true mere conclusions unsupported by specific facts. *Pooh–Bah Enterprises, Inc. v. County of Cook*, 232 Ill.2d 463, 473 (2009). The court is to construe the complaint liberally and should not dismiss it unless it is clearly apparent from the pleadings that "no set of facts can be proved which would entitle * * * plaintiff[s] to recover." *Napleton v. Village of Hinsdale*, 229 Ill.2d 296, 305 (2008). The critical inquiry is whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action on which relief may be granted.

Plaintiffs counter that the numerous factual allegations contained in their Complaints, coupled with the inferences to be made therefrom, provide a sufficient basis to conclude that the shooter both saw and was influenced by Smith & Wesson's advertisements. Plaintiffs assert the Court should take reasonable inferences in Plaintiffs' favor from multiple sets of corroborating facts in the Complaints. The Court can infer that an avid player of first-person shooter games was likely exposed to ads targeting that demographic and was prone to being motivated by ads mimicking those games. That inference can be made from allegations that Smith & Wesson's advertisements purposefully mimic first-person shooter video games like Call of Duty-games that the shooter played. (Complaint, 22LA497, ¶¶71-75). The shooter frequently posted videos of himself playing Call of Duty online—including at least one where he was firing an assault rifle from a rooftop into a crowd of civilians. (Complaint, 22LA497, ¶¶112-15). Plaintiffs allege the shooter had a very active online presence on social media. (Complaint, 22LA497, ¶¶105-07, 112-15). Plus, allegations that Smith & Wesson devoted time, money, and resources to marketing its firearms online-including social media platforms disproportionately visited by younger consumers like the shooter. (Complaint, 22LA497, ¶76). Reasonable inferences to be

8

made from those allegations are that with the shooter spending a disproportionate amount of time online and on social media, and Smith & Wesson advertising heavily online and on social media, the shooter saw one or more of Smith & Wesson's advertisements and was motivated or inspired by it. Plaintiffs further allege that the shooter repeatedly visualized himself as a "soldier" both in his online gaming videos and in real-life artwork. (Complaint, 22LA497, ¶¶104-06, 112-15). Smith & Wesson used false military branding and imagery to exaggerate an association between Smith & Wesson products and the military. (Complaint, 22LA497, ¶¶79-89).

Smith & Wesson maintains that Plaintiffs cannot establish cause in fact with these allegations because they are based upon mere "information and belief." Citing *Lowy v. Daniel Defense, LLC*, 2024 WL 3521508 (E.D. Va. July 24, 2024), they claim that a plaintiffs' "information and belief" allegations "fail to raise plaintiffs' right to relief above the speculative level and can proceed no further." *Id.* at *3.

However, the Court is not persuaded by this argument for several reasons. First, if they are attempting to suggest that Illinois does not accept allegations made upon "information and belief," there is ample caselaw to suggest that is the not the case. See *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148; *In re Marriage of Reicher*, 2021 IL App. 2d 200454 (2d Dist. 2021); *In re Estate of DiMatteo*, 2013 IL App (1st) 122948; see also 735 ILCS 5/2-605(a) . Second, upon examining the allegations made in the *Lowy* case, there appeared to be a lack of factual allegations made to support conclusions that the shooter relied on the defendants' marketing. The *Lowy* court determined that allegations may be pled upon information and belief but "may not be wholly conclusory." *Id.* In sum, the court found very few allegations to rise above the speculative level. This is in contrast to the present case where the Plaintiffs have set forth the shooter's motivation because of Smith & Wesson marketing, and also extensively pled corroborating facts making it reasonable to infer that such motivation occurred. (*See* Complaint 22LA487, ¶¶125, 140) ("the Shooter purchased an M&P 15 because he consumed and was influenced by Smith & Wesson's unfair and deceptive marketing" and he specifically chose the M&P 15 to commit the shooting because of "its perceived fit for carrying out his mission of inflicting the most violence possible."); *see also* ¶126 (alleging that the Shooter was exposed to Smith & Wesson's marketing on Bud's website).

Likewise, Smith & Wesson's reliance on *Estados Unidos Mexicanos v. Smith & Wesson Brands* is unconvincing to dismiss based on lack of proximate cause. The court stated, "[a]n image depicting an officer's lawful use of a firearm does not suggest to the reasonable consumer

that they should engage in criminal, 'combat-like' conduct." 633 F. Supp. 3d 425, 453-54 (D. Mass. 2022). The *Estados Unidos Mexicanos* court was determining whether plaintiffs had plausibly stated an unfair trade practice by alleging that Smith & Wesson marketed their firearms in a way that "emphasized the ability of civilians to use Smith & Wesson assault rifles in unlawful, military-style attacks." However, in making this statement the court determined that plaintiffs failed to identify any common-law or statutory authority that the advertisements violate. Nor did the plaintiffs allege that specific individuals were exposed to specific unlawful marketing techniques or provide alleged facts that support inferences that specific shooters were motivated to commit crimes as a result of such exposure. *See Estados Unidos Mexicanos v. Smith & Wesson Brands*, 633 F. Supp. 3d 425, 453-54 (D. Mass. 2022) (Court stated it was "unwilling to hold that the advertising of lawful conduct to sell a lawful product, without more, constitutes an 'unfair' act."). Plaintiffs here provide numerous allegations of unlawful marketing techniques and statutory authority that Smith & Wesson marketing and advertisements violated.

The Court finds the *Soto* case more persuasive in its reasoning given similar factual allegations made by Plaintiffs in both cases. There, the Connecticut Supreme Court was determining whether the plaintiffs had standing to bring a claim under the state unfair trade practice law at issue there. *Soto v. Bushmaster Firearms*, 331 Conn. 53, 98 (2019). In making that determination, the *Soto* court examined plaintiffs' allegations that "defendants' wrongful advertising magnified the lethality of the Sandy Hook massacre by inspiring Lanza or causing him to select a more efficiently deadly weapon for his attack." Although determining standing for plaintiffs to bring their claims, the court found a causal link from these allegations for purposes of a motion to dismiss. *Id.*

Proceeding to legal cause, Illinois law is clear that legal cause can still be found even with intervening acts of a third party "where the defendant's acts or omissions create a condition conducive to a foreseeable intervening criminal act. If the criminal act is reasonably foreseeable at the time of the negligence, the causal chain is not necessarily broken by the intervention of such an act." *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203, 224 (1988); *Ney v. Yellow Cab Co.*, 11. 2d 74, 80 (1954). Smith & Wesson argues that Plaintiffs have alleged multiple intervening events by other defendants (including the father, who has pled guilty to criminal conduct, multiple transactions by other defendants, and the shooter.) Citing *Young v. Bryco Arms*, Smith & Wesson states the Illinois Supreme Court has refused to find causation against firearm manufactures where "the claimed harm is the aggregate result of numerous unforeseeable

intervening criminal acts by third parties not under defendants' control." 213 Ill.2d at 446-56; *Beretta*, 213 Ill.2d at 394-414.

The *Young* court did address the issue of proximate cause and, specifically, the issue of legal cause. However, this Court finds both *Young* and *Beretta* distinguishable from the present case. The question ultimately decided by *Young* was, "Is the creation of a public nuisance in the City of Chicago so clearly foreseeable that the business practices of these defendants should be deemed a legal cause of the nuisance, even though it results from the cumulative effect of numerous criminal acts by many third parties?" *Young*, 213 Ill. 2d at 453; *See Beretta*, 213 Ill.2d at 408. Thus, the very question the Illinois Supreme Court was deciding highlights the differences in that case and the one before this Court. In both *Young* and *Beretta*, plaintiffs asserted public nuisance claims against firearm manufacturers in an attempt to hold them responsible for gun violence in Chicago. No allegations were made in either suit of illegal conduct on behalf of defendants, such as violation of state or federal statutes or municipal ordinances. See *Young*, 213 Ill.2d at 455 ("We conclude that it is equally unreasonable to expect defendants to foresee that the aggregate effect of the lawful manufacture and sale of firearms will be the creation of a public nuisance..."); *Beretta*, 213 Ill.2d at 412 (proximate cause not shown since it was not foreseeable that the firearms defendants "lawfully sell would be illegally taken into the city in such numbers and in such a manner that they create a public nuisance"). Further, the *Young* and *Beretta* cases are based on aggregate sales and multiple crimes. They dealt with firearms that changed hands multiple times after the initial sale. Here, Plaintiffs' claims focus on Smith & Wesson's violation of relevant laws through marketing designed and intended to target and encourage third-party criminals to misuse its guns. Multiple sales of firearms and multiple crimes were not committed. The present case involved the marketing, manufacture, and sale of an AR-15, which was sold to the shooter, who committed a mass shooting.

The *Young* court additionally determined that legal cause not being found involved a public policy determination. The court stated:

> We note that despite the existence of numerous statutes declaring various practices and conditions to constitute public nuisances, we have no indication from the legislature that it would be inclined to impose public nuisance liability for the manufacture and sale of a product that may be possessed legally by some persons, in some parts of the state. We are reluctant to interfere in the lawmaking process in the manner suggested by plaintiffs, especially when the product at issue is already so heavily regulated by both the state and federal governments. We, therefore, conclude that there are strong public policy reasons to defer to the

legislature in the matter of regulating the manufacture, distribution, and sale of firearms. *Id.* at 455–56.

Plaintiffs point out that since *Young* was decided, the Illinois legislature enacted 815 ILCS 505/2DDDD(b)(4) ("FIRA"), which prohibits gun companies from engaging in deceptive acts declared unlawful under Section 2 of the CFA. This indicates that public policy favors holding gun companies accountable for engaging in unfair and deceptive marketing that lead to gun violence. Smith & Wesson counters that this argument results in FIRA eliminating the legal causation requirement altogether. The court disagrees and merely finds that the lack of guidance from the legislature referenced by the *Young* court is no longer the case with the language in FIRA. At the very least, it gives an indication that intervening acts are not a barrier as to whether injury to third parties is foreseeable in the marketing and sale of firearms. Thus, the reasoning found in *Young* and *Beretta* does not apply to the present case.

Unlike in *Young* and *Beretta*, here Plaintiffs have sufficiently alleged that Smith & Wesson's unlawful conduct created a condition that foreseeably led to the shooter's criminal act. The Complaints allege: (1) AR-15 style firearms, in particular the Smith & Wesson M&P 15 rifle, are the weapon of choice for mass shooters; (2) mass shooters are typically impulsive young men with hero complexes and delusions of militaristic grandeur; and (3) Smith & Wesson purposefully targeted its marketing of AR-15 style firearms at this group by employing tactics and themes it knew would be disproportionately attractive to dangerous people like the shooter. (Complaint, 22LA532, ¶¶ 54-129, 149.) These allegations set forth conduct by Smith & Wesson that created a condition conducive to a foreseeable intervening criminal act. Accordingly, the shooters' reasonably foreseeable intervening criminal act did not sever the causal chain and the Court finds that Plaintiffs have sufficiently alleged proximate cause.

## II.    Dismissal pursuant to 735 ILCS §5/2-619

A motion to dismiss under section 2–619 alerts the trial court to certain defects or defenses which avoid the legal effect of or defeat the claims in the pleadings. *Mio v. Alberto-Culver Co.*, 306 Ill. App. 3d 822, 824–25 (2d Dist. 1999). The purpose of section 2–619 is to allow for a threshold disposition of questions of law and easily proved issues of fact. *Zedella v. Gibson*, 165 Ill.2d 181, 185 (1995). A section 2–619 motion to dismiss admits the legal sufficiency of the cause of action (absent the defects or defenses raised by the motion) much the same way a section 2–615 motion to dismiss admits a complaint's well-pleaded facts. *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill.2d 112, 115 (1993). The trial court should grant

a section 2–619 motion if, after construing the pleadings and supporting documents in the light most favorable to the nonmoving party, it finds that no set of facts can be proved upon which relief could be granted. *Mio v. Alberto-Culver Co.*, 306 Ill. App. 3d at 825.

      **a.    Do Plaintiffs have standing to maintain their statutory claims[2]?**

      Smith & Wesson asserts the Plaintiffs' claims for violations of both the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA") and the Illinois Uniform Deceptive Trade Practices Act ("DTPA") should be dismissed for lack of standing.  Plaintiffs' Complaints have alleged a violation of Section 2 of the CFA, which makes it unlawful to engage in "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act...." 815 ILCS 505/2

      Addressing this argument as to the CFA, Smith & Wesson states that the Illinois Supreme Court has spoken on the issue, finding that a plaintiff bringing a CFA action "must be the intended target of the alleged deception."  *Tri-Plex Tech. Servs., Ltd.*, 2024 IL 129183, ¶37.  The *Tri-Plex* case involved the seller of commercial-grade carpet cleaning products filing suit against competitors for violations of the CFA and DTPA, alleging the competitors' products contained illegal amounts of chemicals preferable to customers, causing them to lose sales.  The Illinois Supreme Court first stated that the "consumer nexus" test that was applied by the appellate court to find standing does not appear in the CFA and to the extent the appellate court applied the consumer nexus test, it would have no bearing on their case because the case did not involve a breach of contract or any other commercial transaction between the parties. *Id.* at ¶31. Examining other cases applying the "consumer nexus" test, the *Tri-Plex* court found that such a test is irreconcilable with the language of the CFA that imposes a proximate cause requirement. *Id.* at ¶37. "[T]he statutory language expressly requires a plaintiff to plead and prove that the deceptive act or practice proximately caused the plaintiff's injury, which means the plaintiff must

---

[2] This argument applies to Counts I–III of the Roberts group of Plaintiffs (22LA487, 22LA488, 22LA489, 22LA490, 22LA491, 22LA492, 22LA493, 22LA494, 22LA495, 22LA496, 24LA475, 24LA476, 24LA477, 24LA478, 24LA479, 24LA480) ; Count I of the Chupack Plaintiffs (22LA532, 22LA497, 24LA474) ; Counts I–III of the Joyce Plaintiffs (24LA201, 24LA203, 24LA206) ; Counts I–III of the McCarthy Plaintiff (24LA466) ; Count IV–VI of the Uvaldo Plaintiff (24LA471).

be the intended target of the alleged deception. *Id.* citing *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 149 (2002); *Shannon v. Boise Cascade Corp.*, 208 Ill. 2d 517, 525 (2004). The Court concluded that other cases adopting the "consumer nexus" test predated the Court's decision in *Oliveira*, where it was held that a plaintiff who brings a cause of action under the CFA must allege "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Tri-Plex Tech. Services, Ltd. v. Jon-Don, LLC*, 2024 IL 129183, ¶ 37, citing *Oliveira*, 201 Ill. 2d at 149.

Plaintiffs attempt to distinguish *Tri-Plex* from the present case, arguing that the *Tri-Plex* case involved a dispute in which a "business plaintiff" sued another business under the CFA. They conclude that *Tri-Plex* only narrowly focused on "competitive" injuries, and not injuries suffered by individual consumers or members of the general public. Further, Plaintiffs argue the *Tri-Plex* court was discussing proximate cause, rather than standing in this matter. This court disagrees with both contentions by Plaintiffs. While the *Tri-Plex* case did involve parties that were businesses and involved "competitive" injuries, the analysis by the court gave no indication that it was only focusing its holding on this particular type of transaction or injury. In fact, the court relied on analysis and holdings from many cases, including *Shannon v. Boise Cascade Corp.*, 208 Ill.2d 517 (2004), which involved a group of homeowners filing a private cause of action under the CFA against the manufacturer of the composite siding on their homes. The *Tri-Plex* court stated in its holding, "[l]ike the homeowners in *Shannon*, the plaintiff in this case fails to allege in its complaint that the defendants intended for *the plaintiff* to rely upon the alleged misrepresentations on their product labels." *Tri-Plex Tech. Services, Ltd. v. Jon-Don, LLC*, 2024 IL 129183, ¶ 29. Thus, the *Tri-Plex* holding does not appear to be confined only to "business disputes." Moreover, the contention by Plaintiffs that *Tri-Plex* was only addressing proximate cause and not standing is a distinction without a difference. The court's analysis involved a discussion of proximate cause, but it started with the premise that finding standing has the practical effect of excusing the plaintiff from pleading proximate cause. *Id.* at ¶30 ("Although the appellate court couched its holding in a discussion about "standing," the practical effect of the appellate court's ruling was to excuse the plaintiff from pleading the proximate cause element of its cause of action. We disagree with this analysis.") Accordingly, this Court must follow the holding of the Illinois Supreme Court in *Tri-Plex* and find that Plaintiffs have not sufficiently

alleged that Smith & Wesson intended for the Plaintiffs to rely on the alleged deceptive and misleading advertisements and marketing.

Plaintiffs' attempts to point to other cases finding a viable CFA deceptive practices claim is unconvincing. Each of the cases cited was decided before *Tri-Plex* and appears to apply a "consumer nexus" test that *Tri-Plex* clearly abolished. See *Marvellous Day Elec. (S.Z.) Co., Ltd. V. Ace Hardware Corp.*, 2013 WL 4565382, at *5-6 (N.D. Ill. Aug. 27, 2013); *Woodfold Mfg., Inc. v. EMI Porta OPCO, LLC*, 2020 WL 13889769, at *7 (N.D. Ill. Nov. 30, 2020). Further, Plaintiffs' argument that the text and legislative history of 815 ILCS 505/2DDDD ("FIRA") makes it possible for victims of gun violence to assert claims under the CFA is also unconvincing. First, the parties appear to agree that FIRA states it is merely "declarative of existing law and shall not be construed as new enactments." 815 ILCS 505/2DDDD(c). Thus, the amendment of the CFA to add section 505/2DDDD did not supersede the Supreme Court's holdings in *Oliveira*, *Shannon*, or the plethora of caselaw setting forth the elements a plaintiff who asserts a private cause of action under section 10(a) of the CFA must allege: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 149 (2002); see *De Bouse v. Bayer*, 235 Ill. 2d 544, 550 (2009); *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 72 (2007); *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 180 (2005). Second, *Tri-Plex* was decided after FIRA was added and it did not change any part of that court's analysis and reasoning when determining that section 10a requires that the defendant intend for the plaintiff to rely on the deception. Plaintiffs' assertion that FIRA changes this requirement has no support from the Illinois Supreme Court. The assertions that the legislative history makes this intent clear is unpersuasive. The court acknowledges that statements by legislators were made at the time FIRA was added that this section was designed to hold gun manufacturers accountable and would enable victims to bring claims. However, as set forth in Plaintiffs' Complaints, there are various avenues in which the victims are bringing claims involving violations of FIRA, and this is but one.

The Court wants to make clear that its decision that Plaintiffs have not adequately pled the elements for standing only refers to Plaintiffs' Counts for violation of the CFA for deception. The court has a different opinion regarding Plaintiffs' claims for unfairness under the CFA. A

plaintiff may recover under the Act for unfair as well as deceptive conduct. *Rockford Mem'l Hosp. v. Havrilesko*, 368 Ill. App. 3d 115, 121 (2d Dist. 2006); *Crichton v. Golden Rule Insurance Co.*, 358 Ill.App.3d 1137, 1146 (2005). Thus, a practice can be unfair without being deceptive. *Rockford Mem'l Hosp. v. Havrilesko*, 368 Ill. App. 3d 115, 121 (2d Dist. 2006); *People ex rel. Hartigan v. Knecht Services, Inc.*, 216 Ill.App.3d 843, 853 (1991).

Smith & Wesson focuses its standing argument on Plaintiffs' CFA claim regarding deception. The *Tri-Plex* case relied on by them only discussed the issue with regards to a deception claim. Thus, this Court agrees with Plaintiffs that an unfairness claim requires different elements to be alleged than that of deception. In determining whether a given course of conduct or act is unfair, courts observe the Consumer Fraud Act mandates that "consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." 815 ILCS 505/2 (West 1992). The United States Supreme Court in *Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 92 S.Ct. 898 (1972), cited with approval the published statement of factors considered by the Federal Trade Commission in measuring unfairness. *Sperry*, 405 U.S. at 244 n. 5. These factors are (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002), citing *Sperry*, 405 U.S. at 244 n. 5. Unlike Plaintiffs' deception claim, an unfairness claim has no element that the defendant intend for the plaintiff to rely on the unfair conduct. Thus, this Court cannot find that Plaintiffs lack standing to make their Illinois Consumer Fraud Act-Unfairness claims. Plaintiffs made additional arguments that they met the pleading requirements for such a claim, but Smith & Wesson does not make such an argument pursuant to 2-615, or otherwise. That said, this Court will not address it.

Next, the Court proceeds to Smith & Wesson's lack of standing argument concerning Plaintiffs' claim for violation of the Illinois Deceptive Trade Practices Act. The purpose of the Deceptive Trade Practices Act is to prohibit unfair competition. *Phillips v. Cox*, 261 Ill. App. 3d 78, 81 (1994). The Deceptive Trade Practices Act does not provide a private cause of action for damages. *Glazewski v. Coronet Insurance Co.*, 108 Ill. 2d 243, 253 (1985). Instead, the statute authorizes private lawsuits for injunctive relief. 815 ILCS 510/3 (West 2020) ("A person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable.").

Smith & Wesson argues Plaintiffs have failed to allege any facts demonstrating that their conduct both deceived and harmed Plaintiffs, and that it is likely to deceive and harm Plaintiffs in the future. *Aliano v. Louisville Distilling Co.*, 115 F. Supp. 3d 921, 928-29 (N.D. Ill. 2015). However, the Court disagrees that the *Aliano* court produced this holding and that the DTPA requires such allegations in order for the Plaintiffs to sufficiently plead a violation under the DTPA. The court in *Aliano* was dealing with a consumer alleging a violation of the DTPA and the court dismissed due to the plaintiff failing to allege a likelihood of future damage. *Aliano*, 115 F. Supp. 3d at 929. The *Aliano* court did not hold that the defendant's conduct must both deceive and harm plaintiff and a different consumer's confusion was not sufficient. In fact, the court assumed *arguendo* that a different consumer's confusion could be sufficient. *Id.* at 929 (noting that "[e]ven if the ILDTPA applied when a plaintiff will be damaged due to a different consumer's confusion, Fratelli does not allege such confusion here.")

Likewise, Smith & Wesson cites *Lawyers Title Ins. Corp. v. Dearborn Title Corp.* for the proposition that injunctive relief under the DTPA depends on allegations and proof that the plaintiffs-not others- were misled and are likely to be misled again. However, the court in *Lawyers Title* stated: "Although plaintiffs under the Act are typically competitors or customers of the defendant, the Act does not limit standing to those parties." *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 904 F. Supp. 818, 822 (N.D. Ill. 1995); *See Storck USA, L.P. v. Levy*, No. 90 C 5382, 1991 WL 60562 (N.D.Ill. April 15, 1991). The Act does, however, limit standing to "a person likely to be damaged by a deceptive trade practice." 815 ILCS 510/3. *See Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 904 F. Supp. 818, 822 (N.D. Ill. 1995); *Baughman v. Martindale–Hubbell, Inc.*, 129 Ill.App.3d 506, 472 N.E.2d 582, 585, 84 Ill.Dec. 622, 625 (4th Dist.1984) ("To state a cause of action for injunctive relief, a plaintiff must minimally allege that he is likely to be damaged by another's deceptive trade practice.")

The court agrees with Plaintiffs that their well-pled allegations meet that standard here. Plaintiffs allege that Smith & Wesson violated subsection 510/2(a)(2), (a)(5), (a)(7), and (a)(12) by falsely associating its line of rifles with U.S. Military personnel and marketing its "civilian line of rifles by promoting its militaristic uses." (Complaint, 22LA487, ¶205). Smith & Wesson's practices "create the false impression that its rifles [are] utilized and/or endorsed by these reputable users" and that "the M&P rifles are of the same standard, quality, or grade that the U.S. military uses." (Complaint, 22LA487, ¶¶202, 209). Plaintiffs allege Smith & Wesson marketed and continue to market the M&P rifle line in this manner despite evidence of their increasing use

in mass shootings. (Complaint, 22LA487, ¶218). "Smith & Wesson continues. . . to perpetuate the misleading marketing of its assault rifles, and these products continue to pose a threat to all members of the public, including Plaintiffs". (Complaint 22LA487, ¶219). Thus, the Court finds that the Plaintiffs have sufficiently pled the elements of a DTPA claim.

**b.    Does the PLCAA provide immunity to Smith & Wesson for claims resulting from the Shooter's criminal misuse of firearms?**

In 2005, Congress passed the Protection of Lawful Commerce in Arms Act (PLCAA). This statute gives immunity to the firearms industry for some, but not all, civil liability arising from injuries caused by firearms when they are used by criminals.  *See* 15 U.S.C. §§ 7902(a) and 7903(5)(a).  Pursuant to the PLCAA, courts must "immediately dismiss[ ]" any case meeting the definition of a "qualified civil liability action." 15 U.S.C. §7902(b). A qualified civil liability action includes, among other things, civil actions "brought by any person against a manufacturer seller of a qualified product. . . for damages. . . or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party. . . ."*Id.* §7903(5)(A).

Congress carved out six exceptions to the definition of "qualified civil liability action," pursuant to which a seller or manufacturer of qualified products may be held liable for third-party crimes committed with their products.  *Id.*  Of those six exceptions, Plaintiffs point to two that apply here, thus defeating Smith & Wesson's claim of immunity: (a) "an action brought against a seller for negligent entrustment or negligence per se;"[3] and (b) "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought[.]" *Id.* §§7903(5)(A)(ii)-(iii).  The Court will address the second exception mentioned first, commonly known as the predicate statute exception.

Initially, Smith & Wesson argues that Plaintiffs' common law claims are barred by the PLCAA.[4] Citing *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1135-36 (9th Cir. 2009), they assert that Congress clearly intended to preempt common-law claims including "classic negligence. . . theories of liability."  However, this assertion ignores the language in the PLCAA that it does not

---

[3] The Uvaldo Plaintiffs (24LA471) bring Negligent Entrustment claims against Smith & Wesson and the Gun Store Defendants.
[4] All Plaintiffs have brought causes of action for negligence, intentional infliction of emotional distress and negligent infliction of emotional distress alleging that Smith & Wesson breached its duty of care by engaging in conduct where they knowingly violated the CFA and the DTPA and that this was a proximate cause of harm to Plaintiffs.

apply to "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute." 15 U.S.C. §7903(5)(A)(iii) (emphasis added). As pointed out by Plaintiffs, that language is in contrast with other exceptions in PLCAA, such as the exceptions for "an action for breach of contract" and "for negligent entrustment." 15 U.S.C. §7903(5)(A)(ii), (iv) (emphasis added). Plaintiffs have alleged in their Negligence, IIED and NIED causes of action that Smith & Wesson knowingly violated the ICFA and IDTPA. Further, the *Ileto* case and other cases relied on by Smith & Wesson for this argument are distinguishable. None of those cases alleged a knowing violation of a predicate statute. Instead, they held that the PLCAA preempts general negligence claims seeking damages resulting from the criminal use of a firearm, with no allegations pertaining to a knowing violation of a predicate statute. The *Ileto* court was only addressing the issue of a plaintiff's claim based on general tort theories of liability which plaintiffs claimed was codified into the California Civil Code, not claims of liability based on state unfair trade practice statutes directed at marketplace activities. Further, the Court finds cases cited by Plaintiffs analogous to this matter. In those cases, courts allowed negligence claims premised, at least in part, upon alleged knowing violations of state unfair trade practice statutes to proceed under the predicate statute exception. *See Prescott v. Slide Fire Solutions*, 410 F.Supp.3d 1123; *Goldstein v. Earnest*, No. 37-2020-00016638-CU-PO-CTL; *Apolinar, et al. v. Polymer80, Inc.*, No. 21STCV29196 (Cal. Super. Ct. L.A. Cty).

Next, Smith & Wesson argues the provisions of the CFA and DTPA do not serve as predicate statutes under the PLCAA's predicate exemption. They maintain that Congress did not intend for broad, generalized unfair trade practice state statutes directed at marketplace activities generally, such as the CFA and DTPA, to serve as predicate statutes. As support, they cite two cases *City of New York v. Beretta U.S.A Corp.*, 524 F.3d 384 (2d Cir. Ct. App. 2008) and *Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. Ct. App. 2009). In *Beretta*, the court held that the predicate exception does encompass statutes "that do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of firearms." *Id.* at 404. Smith & Wesson cites *Beretta* as rejecting an interpretation of the statutory language "applicable to the sale or marketing of the product" to mean merely "capable of being applied to the sale and marketing of the product," because such an interpretation would be a "too-broad reading of the predicate exception" and "would allow the predicate exception to swallow the statute, which was intended to shield the firearms industry from vicarious liability for harm caused by firearms that were lawfully distributed into primary markets." *Id.* at 401-02. Further, in *Ileto*, the court held that "Congress

had in mind only. . . statutes that regulate manufacturing, importing, selling, marketing, and using firearms or that regulate the firearms industry-rather than general tort theories that happened to have been codified by a given jurisdiction." *Ileto*, 565 F.3d at 1134. Thus, Smith & Wesson concludes that the prohibitions of the CFA and DTPA are statutes of general applicability, like those statutes examined by *Ileto* and *Beretta*, that Congress did not intend to be predicate statutes under §7903(5)(B)(iii).

This Court disagrees with Smith & Wesson's reasoning and conclusion for several reasons. First, both cases relied on were addressing the predicate statute exception's application to general tort and nuisance statutes. Such general common law tort theories of negligence and nuisance at issue in these cases can apply to any private conduct capable of being tortious. Unlike statutes specifically regulating sales and marketing of goods contained in the CFA and DTPA. This is obvious when examining both courts' reasoning and holdings. In *Beretta*, the court expressly stated:

> [w]e find nothing in the statute that requires any express language regarding firearms to be included in a statute in order for that statute to fall within the predicate exception. We decline to foreclose the possibility that, under certain circumstances, state courts may apply a statute of general applicability to the type of conduct that the City complains of, in which case such a statute might qualify as a predicate statute. *Beretta*, 524 F.3d at 399–400.

The *Beretta* court went on to hold that the predicate statute does encompass statutes that courts have applied to the sale and marketing of firearms; and "does encompass statutes that do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of firearms." *Id.* at 404.

The *Ileto* court specifically rejected the defendant's proposed restrictive meaning of the term "applicable"-- that the requirements of the predicate exception would be met only if plaintiff alleged a knowing violation of a statute that pertained exclusively to the sale or marketing of firearms. *Ileto*, 565 F.3d at 1134. It held that the examples of predicate statutes listed in the PLCAA suggest that defendant's asserted narrow meaning was incorrect, because some of the examples do not pertain exclusively to the firearms industry. *Id.* Ultimately, the court concluded that general tort law claims were intended to be preempted by Congress. However, unlike the assertion made by Smith & Wesson, the *Ileto* court did not preclude the possibility that general sales and marketing statutes that do not exclusively pertain to firearms could be sufficient as predicate statutes under the PLCAA.

Sales and marketing statutes under state Unfair Trade Practices Acts were examined by the court in *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53 (2019). In *Soto*, the Connecticut Supreme Court held that the Connecticut Unfair Trade Practices Act, as applied to plaintiffs' allegations, falls within one of the PLCAA's exceptions. This Court finds the analysis and reasoning of the *Soto* court very persuasive and relies on it to reach its own conclusion. In *Soto*, the court discussed the definition of "applicable" and acknowledged that the dictionary definition of the term might support a narrower reading of the predicate exception, but if Congress had intended to limit the scope of the predicate exception to violations of statutes that are "directly, expressly, or exclusively applicable to firearms, however, it easily could have used such language, as it has on other occasions. The fact that the drafters opted instead to use only the term "applicable," which is susceptible to a broad reading, further supports the plaintiffs' interpretation." *Soto*, 331 Conn. at 120 (2019). In reviewing the statutory framework of the PLCAA, the *Soto* court determined that the contention that Connecticut's Unfair Trade Practices Act qualified as a predicate statute as applied to wrongful marketing claims "finds additional support in the repeated statutory references to laws that govern the marketing of firearms." *Id.* at 121. The predicate exception expressly provides that the "qualified civil liability actions" from which firearms sellers are immune shall not include "an action in which a manufacturer or seller of a [firearm] knowingly violated a State or Federal statute applicable to the sale or *marketing* of the [firearm] ...." (Emphasis added.) 15 U.S.C. § 7903 (5) (A) (iii) (2012). However, when the PLCAA was enacted, there were no federal laws specifically regulating the marketing of firearms. The *Soto* court pointed out that if Congress intended the predicate exception to encompass laws that prohibit the wrongful marketing of firearms, and if no laws expressly and directly do so, then the only logical reading of the statute is that Congress had some other type of law in mind. *Soto*, 331 Conn. at 123. "At both the federal and state levels, false, deceptive, and other forms of wrongful advertising are regulated principally through unfair trade practice laws such as the FTC Act and its state analogues." *Id.* In sum, the *Soto* court reasoned:

> Because Congress clearly intended that laws governing the marketing of firearms would qualify as predicate statutes, and because Congress is presumed to be aware that the wrongful marketing of dangerous items such as firearms for unsafe or illegal purposes traditionally has been and continues to be regulated primarily by consumer protection and unfair trade practice laws rather than by firearms specific statutes, we conclude that the most reasonable reading of the statutory framework, in light of the decision of the Second Circuit in *New York* v. *Beretta U.S.A. Corp.*, supra, 524 F.3d

at 384, is that laws such as CUTPA qualify as predicate statutes, insofar as they apply to wrongful advertising claims. *Soto,* 331 Conn. at 129.

Additionally, the *Soto* court addressed defendant's argument, similar to Smith & Wesson's argument in this case, that construing a statute of general applicability such as CUTPA to be a predicate statute would lead to an absurd result. The court first assumed that, as a general matter, "the predicate exception cannot be so expansive as to fully encompass laws such as public nuisance statutes insofar as those laws reasonably might be implicated in any civil action arising from gun violence." *Id.* at 135. However, the court concluded that the wrongful marketing allegations made by plaintiffs may proceed without leading to this feared absurd result. The plaintiffs alleged a specific, narrowly framed wrongful marketing claim involving one specific family of firearms sellers that advertised or marketed one particular type of assault weapon in an unlawful way. The *Soto* court found that this wrongful marketing claim alleged precisely the sort of illegal conduct that Congress did not intend to immunize. *Id.*

This Court follows the reasoning and analysis of *Soto* and concludes that the PLCAA does not bar Plaintiff's negligence or statutory claims alleging violations of the CFA and DTPA due to wrongful marketing and advertising. There is nothing in the text of PLCAA to indicate that Congress intended to shield Smith & Wesson from liability based on Plaintiffs' allegations.

Plaintiffs assert an additional argument that if there was any doubt as to the CFA and DTPA's applicability to the firearms industry, it was erased when the Illinois General Assembly enacted 815 ILCS 505/2DDDD (FIRA). This made it unlawful under the CFA to "[a]dvertise, market, or promote a firearm-related product in a manner that reasonably appears to support, recommend, or encourage individuals to engage in unlawful paramilitary or private militia activity in Illinois, or individuals who are not in the National Guard, United States armed forces reserves, United States armed forces, or any duly authorized military organization to use a firearm-related product for a military-related purpose in Illinois." 815 ILCS 505/2DDDD(b)(2). Smith & Wesson's response is the same as addressed above regarding general sales and marketing statutes. They claim nothing changed with the enactment of FIRA and it still is not "applicable" to the sale or marketing of firearms, just as the general sales and marketing statutes contained in the CFA and DTPA. However, the "applicability" argument was addressed previously and this Court found that the sales and marketing statutes in the CFA and IDTPA are "applicable to the sale and marketing" of a firearm. It follows that FIRA, a statute that is

specifically aimed at firearm sales and marketing, would also qualify as a predicate statute under the PLCAA.

That said, Smith & Wesson also asserts that FIRA cannot apply as a predicate statute because Plaintiffs fail to allege any "knowing" violation of a statute. According to Smith & Wesson, under Section (b)(2), were they deemed to have "reasonably appear[ed]" to support or encourage militia or quasi-military use of its product, then the law would be violated. Thus, the statute is not outlawing conduct alone, but just the mere "appearance" of having engaged in conduct. Smith & Wesson contends that this suggests liability even if Smith & Wesson had no way of knowing that its conduct was unreasonable. The Cout interprets this argument as claiming that predicate statutes can only be those that impose concrete obligations and prohibitions that a firearm industry member can understand and comply with, not one that imposes broad duties of care. This argument is unconvincing. First, there is nothing in the predicate exception that describes statutes applicable to the sale and marketing of firearms for the purpose of the predicate exception in terms of "concreteness." Trying to read in some kind of requirement for concrete obligations ignores where the PLCAA has defined permissible civil causes of action in terms of "broad" duties. Actions for negligent entrustment, actions for breach of warranty in connection with the purchase of a firearm, and actions for injuries due to defective design of a firearm when those injuries do not arise from the criminal use of a firearm are civil actions specifically authorized by the PLCAA to bring against the firearm industry. The causes of action involve liability based on a general duty of care (negligent entrustment), and/or involve questions of reasonableness (design defect claims and implied warranty of merchantability). This leads to the conclusion that Congress did not think firearms manufacturers and sellers were not capable of understanding legal obligations framed in terms of broad duties and standards. Even so, the provisions of Section (2)(b) sufficiently provide concrete obligations such that a firearm manufacturer and/or seller could knowingly violate them. The provision is clear that a firearm industry member may not advertise, market, or promote a firearm-related product in a manner that reasonably appears to support, recommend, or encourage individuals to engage in unlawful paramilitary or private militia activity in Illinois. Smith & Wesson takes issue with the term "reasonably appears" and suggests that the inclusion of this term suddenly makes the statute incapable of understanding because there is no way of knowing what their obligation is under the statute. However, that is just not the case. The statute clearly prohibits advertising, marketing, or promotions that support, recommend, or encourage individuals to engage in unlawful

paramilitary or private militia activity in Illinois. Just because the language includes the term "reasonably appears" does not transform it into a broad, vague statute incapable of being understood.

Smith & Wesson's additional argument that Plaintiffs have failed to allege causation which is also required to invoke the predicate exception of the PLCAA is equally unavailing. They invoke the same arguments as their request for dismissal pursuant to 2-615 for failing to state a claim for negligence due to lack of proximate cause. For the same reasons as those expressed by this Court in Section I.b., the Plaintiffs have sufficiently alleged proximate cause at this stage of the proceedings.

The Uvaldo Plaintiffs bring a negligent entrustment claim against Smith & Wesson and argue this claim is authorized under the PLCAA under a different exception. The Court agrees that an exception under the PLCAA exists for negligent entrustment claims, but finds the Plaintiffs have not sufficiently stated a claim for negligent entrustment in this matter. As pointed out by Smith & Wesson, Plaintiff's allegations do not sufficiently state that Smith & Wesson were the firearm sellers at the wholesale and retail level. Despite the Plaintiffs' claims, their complaint allegations only establish that they manufactured and then shipped the rifle to Sports South LLC, and then the rifle was subsequently shipped to Budsgunshop.com and then to Red Dot Arms. The allegations do not meet the definition of negligent entrustment found in the PLCAA: "the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others." 15 U.S.C.A. § 7903(5)(B) (West). Plaintiffs' stretched interpretation of "seller" would render meaningless the distinction between "manufacturers" and "sellers" found in the PLCAA and would make the term "manufacturer" redundant. *See Estados Unidos Mexicanos,* 633 F. Supp. 3d at 448 (rejecting a conclusory allegation that manufacturer defendants were also "sellers" because the complaint did not plausibly allege that the manufacturers satisfied the statutory definition of a "seller"). Accordingly, the Court finds that the Uvaldo Plaintiff's negligent entrustment claim against Smith & Wesson should be dismissed.

## II.    Is FIRA Constitutional?

Plaintiffs assert claims against Smith & Wesson under section (b)(2) and (b)(4) of 815 ILCS 505/2DDDD ("FIRA"), alleging that Smith & Wesson advertised firearms "in a manner that reasonably appears to support, recommend, or encourage individuals to engage in unlawful

paramilitary or private militia activity in Illinois, or individuals who are not in the National Guard, United States armed forces reserves, United States armed forces, or any duly authorized military organization to use a firearm-related product for a military-related purpose in Illinois", and that Smith & Wesson otherwise engaged "in unfair methods of competition or unfair or deceptive acts or practices declared unlawful under Section 2 of [the] Act." In addition, Plaintiffs support their argument that the predicate statute exception in the PLCAA applies to their claims because FIRA is a statute "applicable to the sale or marketing" of firearms. In their Motion to Dismiss, Smith & Wesson asserts that the provisions of FIRA are unconstitutional by violating the First Amendment, Second Amendment, and Dormant Commerce Clause of the U.S. Constitution.

> a.   **Does FIRA violate the First Amendment?**

Smith & Wesson makes several arguments to support their contention that FIRA violates the First Amendment, including that it is an unconstitutional content-based restriction on speech, it represents viewpoint discrimination, and it is unconstitutionally vague in its obligations.

In any challenge under the First Amendment, it is important to recognize that the First Amendment is not absolute. There are some categories of speech that are unprotected, and some categories that are less protected. "Commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values," and is subject to "modes of regulation that might be impermissible in the realm of noncommercial expression." *Florida Bar v. Went For It, Inc.*, 115 S.Ct. 2371, 2375 (1995), quoting *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 477 (1989), quoting *Ohralik v. Ohio State Bar Assoc.*, 436 U.S. 447, 456 (1978); see also *Scott v. Ass'n for Childbirth at Home, International*, 88 Ill.2d 279, 287 (1981). Commercial speech consists of "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 561 (1980). A challenge to application of a commercial speech restriction is analyzed under the four-part framework set out in *Central Hudson Gas*. See *Florida Bar*, 115 S.Ct. at 2375. Under *Central Hudson Gas*, it must first be determined whether the commercial speech at issue is protected speech under the First Amendment, that is, the expression concerns lawful activity and is not misleading. If so, the commercial speech may be regulated, nonetheless, provided: the government asserts a substantial interest in support of its regulation; the regulation is shown to directly and materially advance

that interest; and there exists a reasonable "fit" between the government's ends and the means chosen to accomplish those ends. *Central Hudson Gas*, 447 U.S. at 564–65.

Applying the *Central Hudson* test to FIRA involves first asking whether the speech that is being restricted by Illinois law can be considered commercial speech. The definition laid out by *Central Hudson* is speech that is solely related to the economic interests of the speaker and its audience. *Central Hudson*, 447 U.S. at 561. FIRA restricts advertisements and marketing by firearm manufacturers and sellers. There is no doubt that when firearm manufacturers and sellers advertise their products, they are doing so with an economic motive in mind, which is profiting from firearm sales. The definition of commercial speech has been met.

Next, the Court must inquire as to whether the speech being regulated promotes illegal activity or false/deceptive material. *Id.* at 566. The Court finds that Sections (b)(2) and (b)(4) of FIRA, at issue in this matter, clearly state they prohibit speech that concerns unlawful activity or is false/deceptive. First, Section (b)(4) regulates only speech that is false/deceptive. This Section prohibits only speech that amounts to a fraudulent or deceptive practice, i.e., false or misleading advertising. Thus, it can only affect speech that is by definition outside the ambit of first amendment protection. See *Scott v. Ass'n for Childbirth at Home, International*, 88 Ill.2d 279, 287 (1981).

Section (b)(2) prohibits the encouragement of "unlawful paramilitary or private militia activity in Illinois or unauthorized individuals . . . to use a firearm-related product for a military-related purpose in Illinois." State law prohibits paramilitary and private militia activity. See Ill. Const., art. XII, § 2 ("The military shall be in strict subordination to the civil power."); 20 ILCS 1805/94, 95 (prohibiting "any body of men or women, other than the regularly organized militia of this State," the U.S. armed forces, and veterans' organizations, "to associate themselves together as a military company or organization, to drill or parade with arms in this State.") Further, Section (a) defines "Unlawful paramilitary or private militia" as "a group of armed individuals, organized privately, in violation of the Military Code of Illinois and Section 2 of Article XII of the Illinois Constitution." 815 ILCS 505/2DDDD(a). The restrictions in Section (b)(2) apply only to speech concerning paramilitary and private militia activity and, given the prohibitions on this activity, there can be no instance where commercial speech promoting "unlawful paramilitary or private militia activity" will include lawful conduct.

The Court could stop at this point because FIRA is clearly restricting speech that promotes illegal activity, and speech that is false/deceptive, which generally receive no

protection from the First Amendment.  See *Central Hudson*, 447 U.S. at 563-64.  However, even if the additional prongs of the *Central Hudson* test are applied to FIRA, it would still survive First Amendment scrutiny.  First, the Court agrees with Plaintiffs that Illinois has a substantial government interest in preventing untrained civilians from engaging in unregulated military and militia activities.  See *Brown v. Glines*, 444 U.S. 348, 354 91980) ("The military is, 'by necessity, a specialized society separate from civilian society.'")(quoting *Parker v. Levy*, 417 U.S. 733, 743 (1974)).  "Illinois's interest in protecting the public from firearms violence" includes prohibiting advertising and marketing that is deceptive, misleading, and supports, recommends, or encourages unlawful paramilitary or private militia activity.  *Horsley v. Trame*, 808 F.3d 1126, 1132 (7th Cir. 2015).  As alleged by Plaintiffs, a 2020 study of gun company and influencer content on YouTube and Twitter found that "military, patriotic, and law enforcement themes" were commonplace," and glorification of military gun use were easily found in contemporary gun advertising. Lisa Jordan et al., *Characteristics of Gun Advertisements on Social Media: Systematic Search and Content Analysis of Twitter and YouTube Posts*, 22 J. MED. INTERNET RES.3. (Mar. 27, 2020), *available at* https://perma.cc/RC8E-C25C.

"If there is an immediate connection between advertising and demand, and the. . . regulation decreases advertising, it stands to reason that the policy of decreasing demand. . . is correspondingly advanced." *United States v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993).  Thus, Sections (b)(2) and (b)(4) directly advance the State's interest of protecting the public from firearms violence and preventing untrained civilians from engaging in unregulated military and militia activities by dampening demand for use of firearms for these unlawful activities.

Finally, FIRA satisfies the final *Central Hudson* factor because it is appropriately tailored to serve the State's interest.  *F.T.C. v. Trudeau*, 662 F.3d 947, 953 (7th Cir. 2011).  Contrary to Smith & Wesson's argument that FIRA is overinclusive, "the fit needn't be perfect [and] not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Id*. Here, Sections (b)(2) and (b)(4) only restrict the support and encouragement of unlawful activity and engaging in false/deceptive practices and they are in proportion to the State's interest.

Smith & Wesson attempts to argue that FIRA fails *Central Hudson* scrutiny because the provisions restricting commercial speech do not directly and materially advance Illinois' substantial interests.  They cite *Junior Sports Magazines Inc. v. Bonta*, as support for their contention stating "dampened demand for firearms among minors cannot itself be a substantial

government interest" if a state allows "minors [to] use guns – which means that a state "cannot
merely gesture to 'common sense' to meet its burden of showing that the law will 'significantly'
advance its goals." 80 F.4th 1109, 1119 (9th Cir. Ct. App. 2023). However, this case is
distinguishable from the current matter and provisions of FIRA that are at issue in this case. The
text of FIRA is quite different from the California law that was declared unconstitutional in
*Junior Sports*. The California law at issue in *Junior Sports* regulated not only speech that
promoted illegal firearm use by minors, but it also restricted advertising legal uses of firearms by
minors, such as hunting. *Id.* at 1117. The California law prohibited firearm sellers from
advertising anything that was "designed, intended, or reasonably appears to be attractive to
minors," a scope so broad that it regulated lawful speech as well as unlawful speech. In contrast,
FIRA's scope is more limited and only regulates speech supporting and encouraging unlawful
activities. Accordingly, Sections (b)(2) and (b)(4) of FIRA satisfy the *Central Hudson* factors
and permissibly regulate commercial speech.

Smith & Wesson additionally argues FIRA is unconstitutionally vague with respect to
protected speech, and under the Due Process clause. A "statute is only unconstitutionally vague
if it fails to define the offense with sufficient definiteness that ordinary people can understand
what conduct is prohibited and it fails to establish standards to permit enforcement in a
nonarbitrary, nondiscriminatory manner." *Hegwood v. City of Eau Clare*, 676 F.3d 600, 603 (7th
Cir. 2012). The degree of vagueness that the Constitution tolerates—as well as the relative
importance of fair notice and fair enforcement—depends in part on the nature of the enactment.
*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982). Thus,
economic regulation is subject to a less strict vagueness test because its subject matter is often
narrower, and because businesses, which face economic demands to plan behavior carefully, can
be expected to consult relevant legislation in advance of action. *Id.* Indeed, the regulated
enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by
resort to an administrative process. Id. Courts have also expressed greater tolerance of
enactments with civil rather than criminal penalties because the consequences of imprecision are
qualitatively less severe. *Id.*

Smith & Wesson asserts FIRA provides no guidance on what advertisement may or may
not "reasonably appear[ ]" to support "military-related purposes" and no guidance on how such a
"reasonable appearance" in advertisements may be "deceptive," thereby creating an
unconstitutional chilling effect on speech. The Court finds this argument unconvincing. It

ignores that FIRA clearly identifies the commercial speech it prohibits. Section (b)(2) lays out what specific conduct cannot be encouraged in the marketing of firearm-related products: unlawful paramilitary and private militia activity. Further, FIRA specifically defines the terms "unlawful paramilitary or private militia" as a "group of armed individuals, organized privately, in violation of the Military Code of Illinois and Section 2 of Article XII of the Illinois Constitution." 815 ILCS 505/2DDDD(a). Smith & Wesson cannot claim that these regulations provide no guidance. FIRA uses well-known standards with clarifying terms to provide the firearm industry with sufficient guidance, no different than countless other constitutional economic regulations. Nor can Smith & Wesson support its argument that FIRA impermissibly "chills" speech. "[T]he potential chilling effect on protected expression must be both 'real and substantial' to invalidate a statute as void for vagueness in a facial challenge." *Ctr. For Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012). Smith & Wesson has not identified any such chilling effect.

Smith & Wesson's argument that the "most stringent vagueness test" known to law applies to their vagueness challenge is equally unconvincing. They contend that FIRA threatens to "impose liability on an entire industry" that enables the exercise "of a basic constitutional right" (the right to keep and bear arms). Thus, FIRA implicates the Second Amendment itself, subjecting itself to this "stringent vagueness test". As explained in the next section of this Order, the Court does not find that FIRA implicates the Second Amendment right to keep and bear arms. Accordingly, the Court will not analyze Smith & Wesson's vagueness argument under a "stringent vagueness test."

Smith & Wesson makes an additional argument that the Smith & Wesson advertisements at issue in Plaintiffs' Complaints are non-actionable protected speech under the First Amendment. However, as stated previously in this Section, it is well settled that commercial speech that proposes an illegal transaction or that promotes or encourages an unlawful activity does not enjoy the protection of the First Amendment. See, e.g., *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496 (1982); *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 388–89 (1973); see also *Thompson v. Western States Medical Center*, 535 U.S. 357, 367 (2002); *Lamar Outdoor Advertising, Inc. v. Mississippi State Tax Commission*, 701 F.2d 314, 321–22 (5th Cir. 1983).

Additionally, when ruling on a motion to dismiss pursuant to 735 ILCS 5/2-615, the court must accept as true all well-pleaded facts in the complaint, as well as any reasonable inferences

that may arise from them. *Borcia v. Hatyina*, 2015 IL App (2d) 140559, ¶ 20. Whether a statement is deceptive under the CFA or DTPA is a question of fact not to be resolved on a motion to dismiss. *People ex rel. Daley v. Datacom Sys. Corp*, 146 Ill.2d 1, 35 (1991). The Plaintiffs' Complaints in the present case allege that Smith & Wesson's marketing was unfair and deceptive by suggesting that its rifles are approved, endorsed, and used by the U.S. Military when they are not (Complaint, 22LA487,¶¶ 63-75, 182-87, 202-09) reasonably appearing to promote the use of firearms by civilians in unlawful military, paramilitary, and militia-related activity (Complaint, 22LA487, ¶¶9, 67, 70, 158); and appealing to young, impulsive men with a propensity for risk and excitement by encouraging them to act out first-person shooter games in real life (Complaint, 22LA487, ¶¶76-89, 159-65). Accordingly, the First Amendment is not implicated by the claims as set forth by the Plaintiffs in their Complaints.

    **b.**    **Does FIRA violate Second Amendment rights?**

Smith & Wesson argues in its Motion to Dismiss that FIRA violates the Second Amendment by imposing burdens on all manner of commerce in arms and no historical tradition of firearm regulation can justify its draconian liability regime. The main thrust of their argument is that FIRA broadly prohibits advertising, marketing, and even promotion of firearms which violates, interferes and, at the very least, implicates Second Amendment rights to keep and bear arms.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. CONST. amend. II. *Newy York State Rifle Ass'n v. Bruen,* is a seminal Second Amendment case decided by the Supreme Court. The majority opinion, written by Justice Thomas, ruled that the Second and Fourteenth Amendments protect the individual right to carry a handgun for self-defense purposes outside the home. 597 U.S. 1, 10 (2022). In its opinion, the Supreme Court devised a two-part test to use for Second Amendment queries. *Id.* at 24. The first part of the test asks if the Second Amendment's plain text covers an individual's conduct; if the answer is yes, the Constitution presumptively protects that conduct. *Id.* The analysis then moves to the second step, which calls on the "government [to] justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

Smith & Wesson argues that courts have recognized that "th[e] right of keeping arms" "necessarily involve[s] the right to purchase and use them." *Andrews v. State*, 50 Tenn. 165, 178 (1871); *accord, e.g., Kole v. Vill. of Norridge*, 2017 WL 5128989, at *9 (N.D. Ill. Nov. 6,

2017)("the Second Amendment right to keep and bear arms for self-defense necessarily includes the right to acquire a firearm"). From this language regarding the right to purchase and use firearms being part of the right of keeping arms, Smith & Wesson extrapolates a connection between marketing and sales of firearms and the right of keeping arms. They reason that citizens can hardly acquire firearms (or firearm-related products) that they have never heard of—thus, marketing and sales are linked to keeping and bearing arms. The Court disagrees and finds this reasoning faulty and contrary to caselaw.

There is a distinction between the individual right to keep and bear arms, and the commercial regulation of firearms. The Second Amendment does not provide businesses a right to sell firearms free of regulations. "There is a longstanding distinction between the right to keep and bear arms and commercial regulation of firearms sales." *Morehouse Enterprises v. ATF*, 2022 WL 3597299, at *8 (D.N.D. Aug. 23, 2022)(finding Second Amendment claim unlikely to prevail on the merits), *aff'd*, 78 F.4th 1011 (8th Cir. 2023)(affirming denial of preliminary injunction). Smith & Wesson cites no laws holding that consumer statutes regulating and investigating conduct relating to firearms are in interference with the right to possess firearms for personal defense. *But see, e.g.*, *Smith & Wesson Brands v. Grewal*, 2022 WL 17959579, at *7 (D.N.J. Dec. 27, 2022)("The State's CFA investigation is not, as S&W characterizes it, a *Bruen*-related 'firearm regulation'"); *Def. Distributed v. Bonta*, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022)(Second Amendment's plain text "quite-clearly" does not include any "implicit[]" right to manufacture arms"), *adopted by* 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022); *United States v. Tilotta*, 2022 WL 3924282, at *6 (S. D. Cal. Aug. 30, 2022)(finding that regulations of the commercial sale of firearms do not fall within the plain text of the Second Amendment and thus *Bruen* did not require the government to provide historical evidence to support its regulations). There is a clear disconnect between individual rights to bear arms and regulating the marketing and sales conduct of firearms-industry members. Contrary to Smith & Wesson's assertion, a marketing and sales regulation that may make it harder for some people to find and acquire firearms does in no way make it impossible or impede people from exercising their Second Amendment rights. The fact that individual consumers have a right to keep and bear arms does not necessitate a government duty to provide arms or make it easy to acquire them on the commercial market.

This Court's refusal to expand the Second Amendment's coverage from the individual self-defense rights discussed in *Bruen* to the commercial sale of firearms is supported by the

Supreme Court's statement in *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008): "nothing in [the Court's] opinion should be taken to cast doubt on. . . laws imposing conditions and qualifications on the commercial sale of arms." Accordingly, FIRA does not trigger the plain text of the Second Amendment, and it is not the type of regulation that *Bruen* instructs the courts to subject to historical scrutiny.

### c.    Does FIRA violate the Dormant Commerce Clause?

Smith & Wesson contends FIRA violates the Dormant Commerce Clause by directly imposing liability for out of state conduct that is entirely lawful where it occurred.  The Constitution vests Congress with the power to "regulate Commerce. . . among the several States."  Art. I, §8, cl. 3.  The Supreme Court has held that the Commerce Clause not only vests Congress with the power to regulate interstate trade; the Clause also "contain[s] a further, negative command," one forbidding the enforcement of "certain state [economic regulations] even when Congress has failed to legislate on the subject." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023), citing *Oklahoma Tax Comm'n v. Jefferson Lines*, Inc., 514 U.S. 175, 179 (1995).  This has come to be called the Dormant Commerce Clause.

Recently, in *Nat'l Pork Producers*, the Supreme Court discussed the Dormant Commerce Clause and how to approach it.  It held that extraterritorial effects alone are not sufficient to state a claim under the Dormant Commerce Clause.  *Id.* at 369-70.  Instead, the Court held that state laws offend the Commerce Clause when they seek to "build up ... domestic commerce" through "burdens upon the industry and business of other States," regardless of whether Congress has spoken.  *Id.* at 369.  This "antidiscrimination principle" was determined to lie at the "very core" of Commerce Clause jurisprudence.  *Id.*

Here, Smith & Wesson fails to allege that Illinois is seeking to "use its laws to discriminate purposefully against out-of-state economic interests."  *Id.* at 364.  No provision in FIRA appears to impose different requirements for in-state versus out-of-state firearm industry members.  If FIRA applies in equal measure to Illinois firearm industry members and non-Illinois firearm industry members, then FIRA does not facially discriminate against out-of-state actors.

However, that is not what Smith & Wesson's argument appears to be in its Motion. Instead, they argue that FIRA is unconstitutional to the extent it "directly regulate[s] out-of-state conduct."  Citing a footnote in the *Nat'l Pork Producers* opinion, they state "law[s] that directly regulate[]out-of-state transactions" exceed "the territorial limits of state authority under the

Constitution." *Id.* at 376 n.1 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 641-43 (1982)(plurality op.)). The issue with this argument is that Smith & Wesson leaves out important qualifying language in the above proposed rule. Specifically, the Supreme Court noted "[b]ut either way, the *Edgar* plurality opinion does not support the rule petitioners propose. That decision spoke to a law that *directly* regulated out-of-state transactions by those with *no* connection to the State." *Id.* at 376 n.1. Any argument by Smith & Wesson that FIRA regulates conduct by firearm industry members with no connection to Illinois is wrong. FIRA regulates only conduct regarding firearm-related products, which are defined as those (1) "sold, made, or distributed in Illinois," (2) "intended to be sold or distributed in Illinois," or (3) "possessed in Illinois, and it was reasonably foreseeable that the item would be possessed in Illinois." 815 ILCS 505/2DDDD(a). Thus, Smith & Wesson has not made a case that FIRA exceeds the territorial limits of Illinois authority. They also provide no argument that FIRA facially discriminates against out-of-state actors. For these reasons, they have not made a viable claim for a violation of the Dormant Commerce Clause.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss Plaintiffs' Complaints is Granted with respect to Plaintiffs' Counts for Violation of Illinois Consumer Fraud and Deceptive Business Practices Act-Deceptive and Unlawful Acts for lack of standing. Dismissal is WITHOUT PREJUDICE.

Defendant's Motion to Dismiss Plaintiffs' Complaints is Granted with respect to Plaintiffs' Counts for Negligent Entrustment against Smith & Wesson. Dismissal is WITHOUT PREJUDICE.

Defendant's Motion to Dismiss Plaintiffs' Complaints is Denied with respect to all other Counts of Plaintiffs' Complaints against Smith & Wesson.[5]

The Matter is continued to May 1, 2025, at 9:00 a.m. for case management conference.

SO ORDERED.

ENTER: _____

Jorge L. Ortiz, Circuit Judge

---

[5] See attached Exhibit A outlining each Plaintiff's individual claims.

33

Dated this ___1st day of April,___ , 2025, at Waukegan, Illinois.

Cases Consolidated under *Roberts v. Smith & Wesson*.

| Law Firm(s) | Parties | RIDs | Complaint |
|---|---|---|---|
| • Everytown Law<br>• Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>• Romanucci & Blandin<br>• Hunt Law<br>  o Appearing only on behalf of the Zeiferts and the Roberts<br>• MDR LAW<br>  o Appearing only on behalf of the Gutmans | • *Roberts*, 22-LA-00000487<br>  o Keely Roberts and Jason Roberts, individually and as parents and next friends of C.R. and L.R.<br>• *Sundheim*, 22-LA-00000488<br>  o Bruce Sundheim as Special Administrator of the Estate of Jacqueline Sundheim<br>• *Straus*, 22-LA-00000489<br>  o Peter Straus and Jonathan Straus as Co-Administrators of the Estate of Stephen Straus<br>• *Rebollar Sedano*, 22-LA-00000490<br>  o Lorena Rebollar Sedano<br>• *Bennett*, 22-LA-00000491<br>  o Lauren Bennett and Michael Bennett, individually and as parents and next friends of W.B. and T.B.<br>  o Terrie Bennett<br>  o Jeffrey Bennett<br>  o Deborah Samuels<br>  o Elliot Samuels<br>• *Rodriguez*, 22-LA-00000492<br>  o Mirna Rodriguez and Oscar Sanchez, individually and as parents and next friends of J.S., K.S., and O.S.<br>• *Tenorio*, 22-LA-00000493<br>  o Amelia Tenorio and Antonio Melgar, individually and as parents and next friends of C.M.<br>• *Vergara*, 22-LA-00000494<br>  o Sylvia Vergara<br>  o Lizet Montez<br>  o Gabriela Vergara | • Cybear Interactive, LLC<br>• Watauga Group, LLC<br>• Clandestine Media Group, LLC | • Count I-Violation of Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505/2 &2BBBB-Unfair and Unlawful Acts (All Pl v. Smith & Wesson Defendants)<br>• Count II - Violation of Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505/2 &2BBBB-Deceptive and Unlawful Acts (All Pl v. Smith & Wesson Defendants)<br>• Count III-Violation of The Illinois Uniform Deceptive Trade Practices Act 815 ILCS 510/2, et seq. (All Pl v. Smith & Wesson)<br>• Count IV-Negligence (All Pl v. Smith & Wesson)<br>• Count V-Negligence (All Pl v. Gun Store Defendants)<br>• Count VI-In-Concert Liability-Restatement (Second) of Torts §876 |

Cases Consolidated under *Roberts v. Smith & Wesson*.

| Law Firm(s) | Parties | RIDs | Complaint |
|---|---|---|---|
| | • *Toledo*, 22-LA-00000495<br> o Ricardo Toledo, individually and as Special Administrator of the Estate of Nicolas Toledo<br> o Petra Toledo<br> o Josefina Toledo<br> o Alejo Toledo<br>• *Zeifert*, 22-LA-00000496<br> o Michael Zeifert and Christine Zeifert, individually and as parents and next friends of B.R.Z., B.M.Z., K.Z., and L.Z.<br>• *Aguilar*, 24-LA-00000475<br> o Adan Aguilar<br>• *Castellanos*, 24-LA-00000476<br> o Castelia Castellanos<br>• *Castillo*, 24-LA-00000477<br> o Alan Castillo<br>• *Gutman*, 24-LA-00000478<br> o Sheila Gutman<br> o Joseph Gutman<br>• *Medina*, 24-LA-00000479<br> o Barbara Medina<br>• *Ring*, 24-LA-00000480<br> o Dana Ring and Greg Ring, individually and as parents and next friends of J.R., Z.R., and A.R. | | (All Pl v. Gun Store Defendants)<br>• Count VII-Negligence (All Pl v. Robert Crimo Jr.)<br>• Count VIII- Battery (certain Pl v. Robert Crimo III)<br>• Count IX-Assault (certain Pl v. Robert Crimo III)<br>• Count X-Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress (certain Pl v. All Defendants)<br>• Count XI-Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress (certain Pl v. All Defendants) |
| • Brady Center to Prevent Gun Violence<br>• Dentons<br>• Edelson PC | • *Chupack*, 22-LA-00000532<br> o Joshua Chupack, individually and as next friend of I.C.<br>• *Turnipseed*, 22-LA-00000497<br> o Elizabeth Turnipseed<br>• *Goldstein*, 24-LA-00000474 | • Cybear Interactive, LLC<br>• Watauga Group, LLC<br>• Clandestine Media Group, LLC | • Count I-Violation of Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505/1, et seq. (All Pl v. Smith & Wesson)<br>• Count II- Negligence (Pl v. Smith & Wesson) |

2

Cases Consolidated under *Roberts v. Smith & Wesson*

| Law Firm(s) | Parties | RIDs | Complaint |
|---|---|---|---|
| | o Craig Goldstein, as Special Administrator of the Estate of Katherine Goldstein<br>o Cassie Goldstein | • Charles Osborne<br>• Leslie Osborne | • Count III-Negligence (Pl v. Gun Store Def)<br>• Count IV-Assault and Battery (Pl v. Crimo III)<br>• Count V-Intentional Infliction of Emot. Distress (Pl v. Crimo III)<br>• Count VI-Negligence and Negligent Infliction of Emot. Distress (Pl v. Crimo III)<br>• Count VII- Negligence and Negligent Infliction of Emot. Distress (Pl v. Crimo Jr.) |
| Levin & Perconti | • *Joyce*, 24-LA-00000201<br>o Michael Joyce<br>• *Z. Kolpack*, 24-LA-00000203<br>o Zoe Kolpack<br>• *S. Kolpack*, 24-LA-00000206<br>o Stephen Kolpack | | • Count I-Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act-Unfairness 815 ILCS 505/2 (Pl v. Smith & Wesson)<br>• Count II- Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act-Deception 815 ILCS 505/2 (Pl v. Smith & Wesson) |

Cases Consolidated under *Roberts v. Smith & Wesson*

| Law Firm(s) | Parties | RIDs | Complaint |
|---|---|---|---|
| | | | • Count III- Violation of the Illinois Uniform Deceptive Trade Practices Act 815 ILCS 510/2 et seq. (Pl v. Smith & Wesson)<br>• Count IV-Negligence (Pl v. Smith & Wesson)<br>• Count V-Negligence (PL v. Gun Store Defendants)<br>• Count VI-Aiding & Abetting (Pl v. Gun Store Defendants)<br>• Count VII-Negligence (Pl v. Crimo Jr.)<br>• Count VIII-Battery (Pl v. Crimo III)<br>• Count IX-Assault (Pl v. Crimo III)<br>• Count X-IIED and NIED (Pl v. All Defendants) |
| Coplan & Crane | *Jaffe,* 24-LA-00000481<br>• Ashlee Jaffe | • Cybear Interactive, LLC<br>• Watauga Group, LLC<br>• Clandestine Media Group, LLC<br>• Charles Osborne | • Count I-Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act-Unfairness 815 ILCS 505/2 (Pl v. Smith & Wesson)<br>• Count II- Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act- |

Cases Consolidated under *Roberts v. Smith & Wesson*

| Law Firm(s) | Parties | RIDs | Complaint |
|---|---|---|---|
| | | • Leslie Osborne | Deception 815 ILCS 505/2 (Pl v. Smith & Wesson)<br>• Count III- Violation of the Illinois Uniform Deceptive Trade Practices Act 815 ILCS 510/2 et seq. (Pl v. Smith & Wesson)<br>• Count IV-Negligence (Pl v. Smith & Wesson)<br>• Count V-Negligence (PL v. Gun Store Defendants)<br>• Count VI-In-Concert Liability-Rstmt (2nd) Torts §876 (Pl v. Gun Store Defendants)<br>• Count VII-Negligence (Pl v. Crimo Jr.)<br>• Count VIII-In-Concert Liability (Pl v. Crimo Jr.)<br>• Count IX-Battery (Pl v. Crimo III)<br>• Count X-Assault (Pl v. Crimo III)<br>• Count XI-IIED and NIED (Pl v. All Defendants) |
| Salvi, Schostok & Pritchard | *McCarthy*, 24-LA-00000466<br>• Estate of A.M. by and through The Chicago Trust Company, NA | • Cybear Interactive, LLC | • Count I-Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act- |

Cases Consolidated under *Roberts v. Smith & Wesson*

| Law Firm(s) | Parties | RIDs | Complaint |
|---|---|---|---|
| | • Estate of Irina McCarthy, by and through The Chicago Trust Company, NA<br>• Margo McCarthy, individually and as Independent Administrator of the Estate of Kevin McCarthy | • Watauga Group, LLC<br>• Clandestine Media Group, LLC<br>• Charles Osborne<br>• Leslie Osborne | • Unfairness 815 ILCS 505/2 (Pl v. Smith & Wesson)<br>• Count II- Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act-Deception 815 ILCS 505/2 (Pl v. Smith & Wesson)<br>• Count III- Violation of the Illinois Uniform Deceptive Trade Practices Act 815 ILCS 510/2 et seq. (Pl v. Smith & Wesson)<br>• Count IV-Negligence (certain Pl v. Smith & Wesson)<br>• Count V-Negligence (certain Pl v. Smith & Wesson Defendants)<br>• Count VI- Count V-Negligence (certain Pl v. Gun Store Defendants)<br>• Count VII-Negligence (certain Pl v. Gun Store Defendants)<br>• Count VIII-Negligence (certain Pl v. Crimo Jr.)<br>• Count IX- Negligence (certain Pl v. Crimo Jr.) |

Cases Consolidated under *Roberts v. Smith & Wesson*

| Law Firm(s) | Parties | RIDs | Complaint |
|---|---|---|---|
| | | | • Count VIII-In-Concert Liability (Pl v. Crimo Jr.)<br>• Count X-In-Concert Liability (Pl v. Gun Store Defendants)<br>• Count XI- In-Concert Liability (Pl v. Crimo Jr.)<br>• Count XII-Battery (certain Pl v. Crimo III)<br>• Count XIII-Assault (certain Pl v. Crimo III)<br>• Count XIV- Assault (certain Pl v. Crimo III)<br>• Count XV-IIED and NIED (certain Pl v. Crimo III)<br>• Count XVI-IIED and NIED (certain Pl v. Crimo III)<br>• Count XVII-Wrongful Death Act (certain Pl v. Smith & Wesson)<br>• Count XVIII-Wrongful Death Act (certain Pl v. Smith & Wesson)<br>• Count XIX-Wrongful Death Act (certain Pl v. Gun Store Defendants)<br>• Count XX-Wrongful Death Act (certain Pl v. Gun Store Defendants) |

7

Cases Consolidated under *Roberts v. Smith & Wesson*

| Law Firm(s) | Parties | RIDs | Complaint |
|---|---|---|---|
| | | | • Count XXI-Wrongful Death Act (certain Pl v. Crimo Jr.)<br>• Count XXII-Wrongful Death Act (certain Pl v. Crimo Jr.)<br>• Count XXIII-Survival Act (certain Pl v. Smith & Wesson)<br>• Count XXIV-Survival Act (certain Pl v. Smith & Wesson)<br>• Count XXV-Survival Act (certain Pl v. Gun Stores)<br>• Count XXVI-Survival Act (certain Pl v. Gun Stores)<br>• Count XXVII-Survival Act (certain Pl v. Crimo Jr.)<br>• Count XXVIII-Survival Act (certain Pl v. Crimo Jr.) |
| • Koskoff, Koskoff & Bieder<br>• Rapoport Law | *Uvaldo*, 24-LA-0000471<br>• Maria Uvaldo, individually and as Co-Independent Administrator of the Estate of Eduardo Uvaldo<br>• Tanya Castro, individually, as Co-Independent Administrator of the Estate of Eduardo Uvaldo; and as mother and next friend of Ian Castro<br>• Fred Castro, individually and as father and next friend of Ian Castro | • NSSF<br>• Cybear Interactive, LLC<br>• Watauga Group, LLC<br>• Clandestine Media Group, LLC | • Count I-Wrongful Death-Negligent Entrustment/Wilful & Wanton Conduct (certain Pl v. Smith & Wesson)<br>• Count II-Survival-Negligent Entrustment/Wilful & |

Cases Consolidated under *Roberts v. Smith & Wesson*

| Law Firm(s) | Parties | RIDs | Complaint |
|---|---|---|---|
| | • Nubia Uvaldo-Hogan, individually and as mother and next friend of Brian F. Hogan<br>• Brian Hogan, individually and as mother and next friend of Brian F. Hogan<br>• Jose Guzman as father and next friend of Mayleen Guzman<br>• Alexander Kuchar<br>• Eley Kuchar<br>• Charles Kuchar<br>• Aubrey Noltemeyer, individually and as mother and next friend of Margaret Noltemeyer and Mary Graham Noltemeyer<br>• Charles W. Noltemeyer, individually and as father and next friend of Margaret Noltemeyer and Mary Graham Noltemeyer<br>• Guadalupe Miranda, individually and as a mother and next friend of Jamie Mazariegos | | Wanton conduct (certain Pl v. Smith & Wesson)<br>• Count III-Negligent Entrustment/Willful & Wanton Conduct (certain Pl v. Smith & Wesson)<br>• Count IV-Wrongful Death-Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, and the Illinois Uniform Deceptive Trade Practices Act 815 ILCS 510/2 (certain Pl v. Smith & Wesson)<br>• Count V-Survival - Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, and the Illinois Uniform Deceptive Trade Practices Act 815 ILCS 510/2 (certain Pl v. Smith & Wesson)<br>• Count VI- Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, and |

Cases Consolidated under *Roberts v. Smith & Wesson*

| Law Firm(s) | Parties | RIDs | Complaint |
|---|---|---|---|
| | | | the Illinois Uniform Deceptive Trade Practices Act 815 ILCS 510/2 (certain Pl v. Smith & Wesson)<br>• Count VII-Wrongful Death-Negligence/Willful and Wanton Conduct (certain Pl v. Smith & Wesson)<br>• Count VIII-Survival Action-Negligence/Willful and Wanton Conduct (certain Pl v. Smith & Wesson)<br>• Count IX-Negligence/Willful and Wanton Conduct (certain Pl v. Smith & Wesson)<br>• Count X-Wrongful Death-Aiding & Abetting (certain Pl v. Gun Stores)<br>• Count XI-Survival Action-Aiding & Abetting (certain Pl v. Gun Stores)<br>• Count XII-Aiding & Abetting (certain Pl v. Gun Stores)<br>• Count XIII-Wrongful Death- |

Cases Consolidated under *Roberts v. Smith & Wesson*

| Law Firm(s) | Parties | RIDs | Complaint |
|---|---|---|---|
| | | | Negligence/Willful and Wanton Conduct (certain Pl v. Gun Stores) |
| | | | • Count XIV-Survival-Negligence/Willful and Wanton Conduct (certain Pl v. Gun Stores) |
| | | | • Count XV-Negligence/Willful and Wanton Conduct (certain Pl v. Gun Stores) |
| | | | • Count XVI-Wrongful Death-Negligent Entrustment/Willful and Wanton Conduct (certain Pl v. Gun Stores) |
| | | | • Count XVII-Survival-Negligent Entrustment/Willful and Wanton Conduct (certain Pl v Gun Stores) |
| | | | • Count XVIII-Negligent Entrustment/Willful and Wanton Conduct (certain Pl v. Gun Stores) |
| | | | • Count XIX-Wrongful Death-Negligent Entrustment (certain Pl v Sports South LLC) |

11

Cases Consolidated under *Roberts v. Smith & Wesson*

| Law Firm(s) | Parties | RIDs | Complaint |
|---|---|---|---|
| | | | • Count XX-Survival-Negligent Entrustment (certain Pl v. Sport South)<br>• Count XXI-Negligent Entrustment (certain Pl v. Sports South)<br>• Count XXII-Wrongful Death-Negligence/Willful and Wanton Conduct (certain Pl v. Crimo Jr.)<br>• Count XXIII-Survival-Negligence/Willful and Wanton Conduct (certain Pl v. Crimo Jr.)<br>• Count XXIV-Negligence/Willful and Wanton Conduct (certain Pl v. Crimo Jr.)<br>• Count XXV-Wrongful Death-Battery (certain Pl v. Crimo III)<br>• Count XXVI-Survival-Battery (certain Pl v. Crimo III)<br>• Count XXVII-Battery (certain Pl v. Crimo III)<br>• Count XXVIII-Assault (certain Pl v. Crimo III)<br>• Count XXIX-Survival-Negligent Infliction of |

12

Cases Consolidated under *Roberts v. Smith & Wesson*

| Law Firm(s) | Parties | RIDs | Complaint |
|---|---|---|---|
| | | | Emotional Distress (certain Pl v. Smith & Wesson, Gun Stores, and Crimo Jr.)<br>• Count XXX-NIED (Pl v. Smith & Wesson, Gun Stores, and Crimo Jr.)<br>• Count XXXI-Survival-NIED (certain Pl v. Crimo III)<br>• Count XXXII-IIED (Pl v. Crimo III) |